## Griffin v. Griffin.

(Decided September 23, 1913).

## Appeal from Boyle Circuit Court.

1. Divorce—Alimony.—While without power to reverse a judgment granting a divorce, this court may review the facts of the case for the purpose of passing on the propriety of the chancellor's action in refusing alimony.

2. Divorce—Alimony.—In an action for divorce and alimony, evidence examined, and held that the chancellor erred in refusing to award alimony to the wife.

3. Divorce—Alimony—Expectancy of Husband May Be Considered.—Where the husband is the only child and prospective heir of his widowed mother, his expectancy may be taken into consideration in fixing the alimony to which the wife is entitled.

4. Divorce—Alimony.—In an action by a wife for divorce and alimony, evidence examined, and alimony fixed at $500.

ROBERT HARDING and EMMET PURYEAR for appellant.

W. J. PRICE for appellee.

Opinion of the Court by William Rogers Clay, Commissioner—Reversing.

Plaintiff, Wadelee Griffin, brought this action against defendant, Fred Griffin, for divorce and alimony. The trial court granted the divorce and awarded her attorneys a fee of $75, but declined to allow her alimony. Plaintiff appeals.

The record discloses that plaintiff and defendant were married on May 4, 1910, and lived together for a short while. At the time of the marriage plaintiff was a young girl 18 years of age, and lived with her father and mother on a farm. The defendant was about 25 years of age, and was the only son of his mother, who was a widow. He and his mother lived on a farm of about 105 acres a mile or two distant from the home of plaintiff.

According to the evidence for plaintiff, the wedding was announced to take place at the home of her parents at 12 o'clock noon on May 4, 1910. The relatives and friends of the contracting parties assembled with the minister and invited guests, but defendant failed to appear at the appointed hour. He was seen in town in his working clothes about 11 o'clock, a. m. He did not come to the wedding until after he had been called over the

telephone twice by the officiating minister. When he came he was several minutes late. After the ceremony plaintiff and defendant went to Lexington in an automobile, accompanied by her father and Mr. Cecil. On this trip the defendant was cool and non-communicative. The next night they returned to Danville, but defendant made no arrangements to have any one meet them, and it was necessary for them to walk into town, about a mile from the depot. Plaintiff telephoned to her father to come in after them. The couple then went to the home of his mother. From that time on she helped with the cooking and housekeeping for him and his mother. At defendant's home they had employed a pet negro boy about 12 or 14 years of age. At one time this boy, who was romping with plaintiff, touched her or seized her by the arm. Defendant did not resent this indignity, but plaintiff got a yard-stick and severely chastised the boy.

On July 12th defendant wrote the following letter to plaintiff's mother:

"July 12, 1910.

"Dear Mrs. Parks:

"I am very sorry to tell you but Wadelee will have to change if we get along any longer. She is hateful, lazy and lies and deceived me by telling some things before we were married, and tried to turn it off by saying she was joking, and that is a black lie; she had as soon lie as eat and you know how she eats. She don't ever want to go up to your place any more, and did not even get up until after breakfast was ready this morning, and won't get up any morning until very late, if she can possibly make it.

"Now if you, Mrs. Parks, or any of the family can make her act and do like she ought to let me know, and if not I will make some other arrangement.

"P. S.—She brags how she can do up there and she can't do a blessed thing here.

"I can name several young married women that are real housekeepers and homemakers and made the home happy right here in the neighborhood, but Wadelee is anything but a housekeeper. She is best at lieing, that is her best and only talent. Answer what you all can do."

Plaintiff took the letter and delivered it to her mother, who put it away for safe keeping. The next day plaintiff's mother carried plaintiff back to defendant's home, and interviewed defendant's mother in regard to plaintiff's mistreatment by defendant. It further ap-

pears from the testimony of defendant's mother that plaintiff performed her household duties cheerfully and well, and that defendant's mother had no fault to find with her. In the month of September, following, defendant again sent plaintiff home. Subsequently he wrote to her the following letter:

"Wadelee:

"Here is the rig, if you wish to came to h——, and if you are having a good time and satisfied all right. Have been very sick since Sunday morning. Am a little better today.

"FRED."

There is further evidence to the effect that defendant would become angry with plaintiff when plaintiff would ask him to go to places of entertainment with her, and treated her in a cold and sullen manner. Defendant had no property of his own. He lived with his mother on a farm owned by her, and consisting of about 105 acres. This farm, together with other property which she owns, is worth about $5,000. Defendant leased this farm from his mother, and the income from it, on which they lived, amounted to between $500 and $600 a year.

On the other hand, the testimony for the defendant is that he was late at the wedding simply because he had overlooked the time. He was always quiet and non-communicative, and this accounts for his being quiet on the wedding trip. The failure of any one to meet them on the return from their wedding journey was due to a mistake, and while he was looking for the vehicle that he expected to meet them, the public conveyance left the station. That was the reason they had to walk back. Plaintiff had been accustomed to doing a portion of the cooking and household work at her own home before she was married. When she came to the home of defendant she merely assisted his mother in doing that which she had formerly done. Defendant frequently accompanied her to entertainments in the neighborhood. On several occasions he also went with her to the Danville Fair and other places of amusement. He was weak and frail, and frequently too tired and sick to go. When he would refuse to do so, plaintiff would get angry with him, and would sometimes call him a liar. The negro boy testifies that on one occasion she threw a wash tub at him. On several occasions after plaintiff left his home he importuned her to return. On one occasion he sent to her a note in very endearing terms, asking her to come

back to his home. This note was delivered to plaintiff and she read it and threw it down. She did not take it to the house for fear of the members of her family. There is evidence to the effect that Tom Parks, the plaintiff's brother, was very angry at defendant, and made threats against him. On this account defendant refrained from going to the home of plaintiff's mother. On one occasion defendant got his cousin, Mrs. Baughman, to accompany him to plaintiff's mother's house. There there was a discussion of all the matters in dispute, and an explanation made with reference to them. While there plaintiff asked her mother when Fred should return for her, and her mother told her to make no promises. On this occasion defendant assured plaintiff that if she would return to him his mother would give up the entire occupancy of the home and would move to town. Plaintiff was perfectly willing to go, but was prevented from doing so by her brother, Tom Parks, and other members of her family, who were very indignant at defendant, and did not care to have their sister return to him. Defendant also appealed to the sheriff of the county, who was a friend of both parties, to try to induce the plaintiff to return. The defendant says he was never able to get to talk to plaintiff alone, but she seemed to be under the guard of some one every time he saw her. He also testifies that Tom Parks curtly asked him to keep out of the matter. Defendant also got a neighbor to intercede for him, without avail. It is also in evidence that he got the pastor of the Baptist church to attempt to persuade plaintiff's family to let his wife return, but this effort was also unsuccessful. Defendant's testimony further shows that he planned a trip out West, and sent notes to his wife begging her to join him, and assuring her in the most affectionate and sincere terms of his love and good intentions. On one occasion when defendant heard of a visit plaintiff had made to the city of Lexington, he took the next train, hoping to have a talk with her there, but again found her in charge of another brother and uncle, and was prevented from talking to her. It is also in evidence that Mrs. Parks missed her daughter exceedingly, and would frequently call her over the telephone and beg her to come and spend a night with her. Often she would break into tears after talking with her daughter. The brother, Tom Parks, was also devoted to his sister. A number of witnesses also testified to the good qualities of defendant, and to his kind treat-

ment of his wife. Defendant's mother says that the letter of July 12th, above set out, was written as a joke, and was not intended to be taken seriously. She protested against plaintiff showing it to her mother. She further says that when she saw the letter with "h—" in it, it had the word "home." She also says that her son and she thought nothing of the incident with the negro boy, because they were under the impression that plaintiff and the boy, who was a pet of the household, were merely romping.

While we have no power to reverse the judgment of divorce, we can, nevertheless, consider the facts and circumstances of the case for the purpose of passing on the propriety of the chancellor's action in regard to alimony. Sabastian v. Rose, 135 Ky., 197; Patrick v. Patrick, 30 Ky., L. R., 1364, 101 S. W., 328; Civil Code, Sec. 427.

While there is evidently much in this case that is not revealed by the record, there are several potent and persuasive facts tending to show defendant's aversion to his wife and the cruel treatment which he accorded her. It must be admitted that the letter of July 12th, which contains statements that, according to defendant's mother, are not sustained by the facts, if seriously intended, constitutes an act of unusual cruelty. While there is some testimony to the effect that the letter was intended as a joke, yet we cannot escape the conclusion that such is not the case. There can be found but few cases where a man overlooks the time of his own wedding. The marriage itself began with this show of indifference. This circumstance predisposes us to the conclusion that when defendant wrote the letter in question he intended it to be taken seriously. Indeed, his own mother attempted to persuade him not to write the letter, and to prevent its delivery to Mrs. Parks. Had it been intended as a joke, he would necessarily have protested against its delivery, and made some effort to have his wife tear the letter up or return it to him. True, his own mother did this, but it does not appear that he sympathized with her in the effort. Furthermore, his subsequent letter, written in September, containing the expression "if you wish to come to 'h—,' " is persuasive of the fact that the letter of July 12th was not intended as a joke, and clearly indicates that his attitude toward plaintiff had not then changed. While some effort is made to show that the word "h—" did read, or was intended to read, "home," we fail to find anything in the

letter itself, or in his then attitude toward his wife, to indicate this is true. Indeed, the word "home" is never so abbreviated. Furthermore, if the word "home" had been intended it is by no means probable that he would have used the preposition "to." The ordinary expression in such a case would be "if you wish to come home;" not "if you wish to come to home." While it may be true that had it not been for the interference of others the troubles between plaintiff and defendant might have been adjusted, yet it cannot be doubted that defendant's treatment of his wife was such as to place on his shoulders the blame of the separation, and to justify her in taking up her home with her mother. There are other things in the record which we have not time to enumerate, but considered as a whole, the facts developed in the record make out a case of cruel and inhuman treatment on the part of the defendant. We, therefore, conclude that plaintiff is entitled to alimony. Though it is true that defendant has no estate of his own, yet he is able to work. He is also the only child of his mother, and will inherit from her her estate. Therefore, not only his probable earnings from his own efforts, but his probable inheritance from the estate of his mother may be taken into consideration. Muir v. Muir, 28 Ky. L. R., 1359, 92 S. W., 314. Taking these facts into consideration, we conclude that plaintiff is entitled to alimony in the sum of $500, payable in four installments of $125 each in one, two, three and four years from the entry of the judgment on the return of this case. We see no reason to change the allowance made to plaintiff's attorneys.

For the reasons indicated, the judgment refusing alimony is reversed and cause remanded, with directions to enter judgment in conformity with this opinion.